###### FOR THE

## COUNTIES OF BRISTOL, PLYMOUTH, BARNSTABLE AND DUKES COUNTY, OCTOBER TERM 1842, AT TAUNTON.

---

###### PRESENT.

Hon. LEMUEL SHAW, Chief Justice.
Hon. SAMUEL S. WILDE, ⎱
Hon. CHARLES A. DEWEY, ⎰ Justices.
Hon. SAMUEL HUBBARD, ⎰

---

## Elijah Ingraham *vs.* Jacob Dunnell & others

A landlord cannot maintain a bill in equity to suppress a nuisance caused to his property before he demised it, and continued afterwards, without joining his tenant as a co-plaintiff: And it seems, that after a hearing upon the merits of such bill, and after the expiration of the tenant's term, the landlord cannot be permitted to amend his bill by joining the tenant.

A party is not entitled to an injunction to restrain an injury caused to his reversionary interest in an estate by a nuisance, unless such injury will probably be irreparable, or cannot be compensated by damages recovered in a suit at law.

Where a bill in equity is brought, praying for an injunction to suppress a private nuisance, and it is doubtful, on the evidence, whether the defendant has not a good defence by prescription or estoppel, the court will not order a perpetual injunction, until the plaintiff has established his right to redress by a trial at law : In such case, if there is no valid objection to the bill, and there is danger of irreparable mischief, the court will direct an issue to be tried at law, and will order a temporary injunction to restrain the defendant in the mean time.

In a bill in equity, filed in August 1839,* the plaintiff set forth, that on the 3d of March 1837, he became seized and pos-

---

* The plaintiff amended his bill, after the defendants had filed an answer hereto, and the defendants filed an answer to the amended bill. The substance of b>th bills and answers is united in the text.

sessed of a water mill and calico works on Beveridge Brook, in the town of Pawtucket, and of certain dwellinghouses, gardens, out houses, &c., near·to said mill, and continued to be seized and possessed thereof, until March 1st 1839, when he demised the same to Horatio N. Ingraham, to· hold for the term of three years, with a covenant for quiet enjoyment, "free from the ad-verse claims of all persons;" and that he still had the reversion thereof, after the expiration of said three years : That in the year 1826, the Pawtucket Calico Manufacturing Company, a corporation, became the owners of the land on which said mill, dwellinghouses, &c. are situate, and erected a dam on which said mill stands, and constructed the mill with machinery and rooms for bleaching, printing and callendering goods, and thence-forth were employed and continued to work the mill in bleach-ing, &c. goods, until the year 1829, when Dwight Ingraham became the owner thereof, who did not continue the same business therein, but put into the mill machinery fitted for manu-facturing cotton goods, and from the year 1830 to the 3d of March 1837, manufactured cotton goods therein : That the plaintiff, after he became the owner of said mill, &c. until he demised the same, as above stated, worked the mill in manufac-turing cotton goods ; that, during all that time, the said houses, &c., were occupied by his workmen in the mill, and their fami-lies ; and that said H. N. Ingraham, his tenant, since the de-mise aforesaid was made, has continued the manufacture of cotton goods in said mill, and that his workmen and their fami-lies have occupied said houses, &c. : That the waters of Bever-idge Brook, at the time of the erection of said dam and mill by the aforesaid corporation, and at the time of the bleaching, &c., of goods there, as before mentioned, were pure and salutary, and proceeded from pure and limpid springs ; and that the plaintiff was entitled to have the same flow to and by his mill and houses, free from noisome admixtures, smells and exhala-tions, for the purposes of cleansing, &c., the goods used and worked in the mill, and for the use of the workmen employed therein.

That the defendants on the 3d of March 1837, and ever

since, by means of their print works, mills and machinery, erected on said brook, above the plaintiff's said works, and of the materials wrought and used there, had impregnated the waters of the brook with noisome and unwholesome washes, drugs, dyestuffs, &c., whereby said waters, running to the plaintiff's mill, and near his houses aforesaid, had become so foul, corrupt, unwholesome, and unfit for use, that the plaintiff and his workmen and tenants, and their families, could not use the same in so beneficial a manner as of right he ought ; and that by reason of said conduct of the defendants, the plaintiff's wells of water, near his said houses, were rendered unfit for use, and the surrounding atmosphere was filled with noisome and unwholesome exhalations from said water, whereby said mill and the machinery therein became discolored and foul, and the health of the plaintiff's workmen was impaired : That, by the same means, the pond of water, raised by the plaintiff's dam, for the working of his mill, was filled with dregs and sediment, so as to impede its operations ; and that his tenant aforesaid had threatened to abandon the mill and his lease thereof, and to refuse to pay the rent reserved.

The prayer of the bill was, that the defendants might be decreed so to operate their said mill, as not to injure the mill, works, workmen and houses of the plaintiff, and forthwith to cease impregnating said waters with unwholesome drugs, &c., or any foul admixtures.

The defendants, in their *answer*, (after objecting to the bill for want of proper parties,) admitted the plaintiff's title to the mill, houses, &c., in his bill mentioned, and that the waters of said brook proceeded from pure and limpid springs, which were above the defendants' mills ; but denied that those waters, running to the plaintiff's mill at the time of the erection thereof, were pure and salutary : The defendants also averred, that in the year 1817 or 1818, a bleaching establishment was erected and put in operation, on the site of their print works, and that shortly afterwards and before the erection of the plaintiff's mill, the business of calico printing was there carried on, and ever since has been, in addition to the business of bleaching ; and

that after the plaintiff's mill was erected, the water, which carried it at first, and has ever since carried it, passed from said bleaching and printing establishment, after having been used for the purpose of bleaching and printing, to the plaintiff's mill, and that by such use of the water by the defendants, it necessarily became impregnated with the various dye-stuffs and materials used in the printing and bleaching of goods : That in the years 1832 and 1833, the owners of the plaintiff's mill, and the owners of the defendants' print works, (under an agreement, hereinafter mentioned,) built a large reservoir above the defendants' pond, on said brook, in equal shares, which reservoir caused a large pond to be raised, which flowed back to the sources of the brook, covering a large surface of swampy land : That said reservoir was still continued and owned by the plaintiff and the defendants, for the benefit of their said several works below it, and that, being sometimes stagnant in the summer, it was offensive to the smell : That before the plaintiff became the owner of his mill, the former owners thereof caused three ponds to be raised on said brook, between the print works of the defendants and the plaintiff's mill ; that the upper pond, the water of which ran from the defendants' print works, was always stagnant, except when the gate was raised by the plaintiff to draw a part thereof into the pond next below, which, and also the lower of said ponds, was also stagnant, except the small part thereof which drove the wheel of the plaintiff's mill : That the plaintiff, and H. N. Ingraham, his tenant, had constantly used said ponds, ever since the plaintiff became the owner of his mill, and had exercised the sole control thereof : That the plaintiff, within a year or two next before the filing of his bill, changed the manner of taking the water to the wheel of his mill, by conducting the water through a canal from his upper pond to the lower side of his lower pond, and thence to said wheel ; thus leaving the whole surface of the middle and lower ponds, except a small space in the lower side of the latter, entirely stagnant the whole time, and useless to him.

The defendants admitted, that by reason of their use of dye-stuffs, &c., the water was discolored, and that some of the sedi-

ment, which ran off with the water, settled in the plaintiff's up per pond and tended to fill it up ; but they denied that the water was thereby injured for any purpose connected with the plaintiff's business of manufacturing cotton goods, or that the filling up of the plaintiff's upper or middle pond had done or would do him any injury in the operation of his mill, or that the plaintiff's wells were in any way injured by the impregnation of the waters of said brook with the dye-stuffs, &c., used by the defendants. They also denied that they caused the offensive exhalations complained of by the plaintiff, (the existence of which, during warm weather, they admitted,) and averred that the same were caused by the plaintiff's retention of the water, in his ponds, as above stated. The defendants also denied that any noisome and unwholesome exhalations from said water had discolored and rendered foul the machinery in the plaintiff's mill, or impaired the health of his workmen, except what might have been caused by the plaintiff's detaining the water as aforesaid.

The defendants further stated, that they, and those under whom they claimed, had erected " various and many dams, mills and other buildings, and put machinery and other apparatus thereon and therein, on the site of their print works, of great value and at great expense, to wit, exceeding the sum of $200,000 ; " and that the same were still kept and maintained by them for the purpose of bleaching and printing calico.

The defendants also averred, that on the 23d of May 1832, Dwight Ingraham, who then owned the plaintiff's mill, &c., and Royal Sibley, who then owned the defendants' print works, made the agreement, (herein before referred to,) with Willard Jenks, an owner of land on said Beveridge Brook, above the works of the defendants, in which agreement it was stipulated that said Dwight and Royal should erect and maintain a dam across said brook, on land of said Jenks, for the purpose of maintaining a reservoir of water for the use, in the first place, of said Royal's bleaching and printing works, and after for the use of the mill of said Dwight ; and that said Royal should be permitted to raise the dam and the water three feet, at his said works, for the purpose of increasing and extending the same :   And that after-

wards, on the 22d of August 1832, it was covenanted and agreed by and between the said Dwight and Royal, that after said Royal had raised his said dam three feet, he should have a right to lower his mill wheel, at said print works, three feet, with the view and for the purpose of further extending and enlarging said works ; and that in consequence of the said agreements and covenants, the said Royal, with the knowledge and consent of said Dwight, expended large sums of money, in the erection and maintenance of said reservoir, and in lowering the wheel at said works, and in enlarging and extending the works ; the said Dwight then knowing that said works were to be used for the purpose of bleaching and printing, as they theretofore had been.

A *replication* was filed by the plaintiff, and evidence was taken and published.

The argument was had at the last October term.

*Eddy*, & *J. Whipple* of Rhode Island, for the plaintiff.

*B. Rand* & *Coffin*, for the defendants.

WILDE, J. This is a case of importance, as it concerns property of great value, in the lawful enjoyment of which each party is entitled to protection. But as the parties have opposite interests, and the free exercise of their rights and privileges, respectively claimed, is incompatible, it will follow that however the case may be decided, one or the other of the parties will be subjected to a loss of property, or other consequential damages, which may be very considerable. We have, therefore, taken time to look into the authorities cited, and to consider the case with attention and deliberation, in the hope that we might come to a decision, which would terminate the present controversy, and so settle and establish the rights and privileges of the parties as to prevent future litigation. We have, however, met with difficulties in our way, which are not to be overcome, without disregarding some of the rules and principles of equity which seem to be well established, and which in their general operation are just and salutary. These we are not at liberty to disregard ; for although courts of equity are invested with large discretionary powers, yet they are not to be exercised arbitra

rily, but are to be governed and restrained by general rules of decision, so that a uniformity of judgment may be preserved, and parties may know their equitable as well their common law rights and liabilities. We are then to consider and determine whether upon the facts established by the evidence, or by the admissions in the pleadings, the plaintiff is entitled to the relief prayed for, according to the established rules and principles of equity ; or whether his appropriate remedy for the grievances complained of is not by an action at law.

· The defendants are charged with the continuance of a nuisance to the plaintiff's water mill and works for the manufacturing of cotton goods, from the 3d of March 1837, to the time of the filing of the bill, by polluting the waters of the stream on which the plaintiff's mill was situate, and above the same, by impregnating the same with sundry noxious and unwholesome drugs, dye-stuffs, and other noxious preparations, whereby the water of the stream, running to the plaintiff's mill, had become corrupt, unwholesome and unfit for use, and so that the plaintiff, with his workmen and tenants, and their families; could not have the use of the same in so wholesome and beneficial a manner as he of right ought to have.

The plaintiff remained in the possession and occupation of his mill and works until the 1st of March 1839, when he demised the same to Horatio N. Ingraham for the term of three years ; and the first question is, whether the plaintiff is entitled, in this suit, to damages for the grievances alleged during this interval ; and we are clearly of opinion that he is not. Indeed on this point there can be no doubt. For the recovery of damages the plaintiff has a complete and adequate remedy at law, and that is the proper and appropriate remedy. Where an injury will admit of a pecuniary compensation, a court of equity will never interpose. And this principle is applicable to the alleged injury to the plaintiff's reversionary interest after his demise to H. N. Ingraham. Numerous cases were cited at the argument, to establish a principle, which no one can doubt, namely, that an action may be maintained by a reversioner for an injury done to his reversion. But his remedy is by an action

at law, and a court of equity will not interpose its authority, unless it can be shown to be necessary to prevent future mischief, and such a mischief as ought to be prevented. The foundation of equity jurisdiction on the subject of nuisance is the probability of irreparable mischief; that sort of material injury by one to the comfort of another, or to his damage, which requires the application of a power to prevent as well as to remedy the evil. Jeremy on Eq. Jurisd. 310. 2 Story on Eq. § 925. But to entitle the plaintiff to relief on this ground, the tenant must be joined as a co-plaintiff. A reversioner may have a separate action at law for an injury done to his reversion. *Jesser* v. *Gifford*, 4 Bur. 2141. But in a suit in equity, the tenant must unquestionably join. Indeed it may be doubted whether any such permanent injury appears to have been done to the reversion, as would maintain an action at law. The gravamen of the complaint is certainly of a transitory nature. But it is not necessary to consider this question ; it being clear that this bill, as it is framed, without joining the tenant as a co-plaintiff, cannot be maintained.

It is averred in the bill, that H. N. Ingraham, the tenant, threatens to abandon the mill and his lease, and to refuse to pay rent. But he has no right so to do ; for if the defendants' acts are unlawful, the tenant's remedy is against them. The plaintiff's covenant in the lease, that the tenant should quietly enjoy, free from all adverse claims, is only against lawful claims. 2 Saund. 178, *note* (8.) 6 Mass. 252.

The question then is, whether the plaintiff may have leave to amend the bill, by joining the tenant as a party. No motion for leave thus to amend has yet been made ; and at this stage of the cause there are obvious objections to its allowance, which it would be difficult to avoid or overcome. Objection was made for the want of parties, in the defendants' first answer, and the plaintiff ought then immediately to have moved for the proper amendment, before issue joined and examination of the witnesses ; and most certainly, before a final hearing on the merits. And now there are also technical difficulties and objections to the amendment. The lease having expired, there is no longer

11 *

any necessity of joining the tenant; for he has his remedy at
law for damages, and has no right to the interposition of the
court by injunction ; so that if the plaintiff should have leave
to amend his bill by making his former tenant a party, he must
then apply for leave to file a supplemental bill, stating the expi-
ration of the lease, and thus to make and unmake a new party
without any change of circumstances.   And unless this may be
allowed, the bill cannot be sustained ; for the plaintiff must show
a good right to maintain his suit at its commencement.

But supposing these difficulties might be obviated by an
amendment of the bill, another objection remains, on which the
defendants' counsel rely, which appears to be sustained by the
authorities.   The defendants' counsel maintain that they have
a good defence at law ; and they contend that they have a good
title by prescription, and by estoppel under the indenture be-
tween Dwight Ingraham and Royal Sibley, from whom the par-
ties respectively derive their titles.   And the defendants deny
also, in their answer, that the impurity of the water in the
stream, and the offensive exhalations therefrom, were caused by
them, but that they arose from the stagnation of the water in the
plaintiff's ponds.

Whether, upon the facts proved or admitted, the defendants
could maintain this defence, in an action at law for the nuisance
alleged, is a question upon which we give no opinion ; but the
right is sufficiently doubtful to entitle them to a trial at law.   A
court of equity is extremely unwilling, as Eden remarks, to in-
terpose without a trial at law, especially where the alleged nui-
sance consists in the exercise of a manufacture.   Eden on In-
junctions, 236.   More especially, it may be added, where the
works complained of are of great value, and a perpetual injunc-
tion might be ruinous.   And in all cases, where the right is
doubtful, the court will direct a trial, and in the mean time,
if there be danger of irreparable mischief, or if there is any
other good cause for granting a temporary injunction, it will be
ordered, so as to restrain all injurious proceedings ; and when
the plaintiff's right is fully established, a perpetual injunction
will be decreed.   2 Story on Eq. § 925.   Mitf. Pl. (3d ed.) 111.

If then the present case depended solely on this last ground of defence, the question would be, whether the bill should be now dismissed, or the proceedings should be suspended until the plaintiff's legal right and the defendants' liability should be determined by a trial, on an issue to be framed for that purpose. This latter course might be proper, if there were no objections to the bill, and a ground appeared for a temporary .njunction to restrain the operations of the defendants' works. But no such ground appears in the present case. And when we consider the objections to the bill, and to the allowance of an amendment, at this late stage of the proceedings, (which, if allowed, ought not to be allowed without the payment of costs,) we are of opinion that the bill must be dismissed, leaving the plaintiff to seek his remedy at law, as he may be advised. And if he should establish his right, then an application may be made for an immediate injunction. In such a case, a temporary injunction would be ordered unless the defendants could show good cause against such an order.                *Bill dismissed.*